Good morning. May it please the Court, my name is Keith Karnes and I'm here on behalf of the veteran, the defendant in the US Trustee's action, Jerry Jones. And the issue that is on appeal is the language of 11 U.S.C. 727 D.1, which deals with the revocation of a bankruptcy discharge. And the statute on its face says that the discharge shall be revoked if such discharge was obtained through the fraud of the debtor. So let's, I want to understand your position in this case. There's no dispute that the debtor engaged in some nondisclosure of assets, correct? That's not the issue that's on appeal at this time. Right, okay, so you're not The Court's deference is so high that we didn't want to start Yeah, right, you're not attacking that That's correct So your position is that it wasn't a sufficient amount of assets that were nondisclosed to have been material and whether or not a discharge would be granted. Is that a fair statement? No, that's part of the statement Okay, so tell me what your position is So the position is that there has to be some sort of, the US Trustee has said that this can't be the case, but I think that Nielsen makes it clear that Just tell me, tell me what your It's a much more standard, but for the fact that the debtor That even if he had disclosed, even had he, it wouldn't have made any difference. He would have gotten a discharge anyway. Is that your position? That's part of it, yes. That regardless of what he did, his fraud, as the trial court determined it to be, did not create the discharge. And here's why that's important for a couple of reasons. First is because the US Trustee brought this action on the last day possible. There's a one-year limitation on this. And bankruptcy is supposed to be, you know, give finality to the debtor and the creditors both. Here we have a situation where the US Trustee gets a call from a creditor saying, you know, we missed the deadline, can you bring in action? But that wouldn't matter if your client had failed to disclose a billion dollars in assets, would it? You're right. It wouldn't matter. So the conduct of the trustee and when this occurs really isn't material to how we decide this case. And why I'm asking this is because you seem to be saying there's a dollar threshold that's material and there's a dollar threshold that isn't. So define the threshold that's material. Well, I believe that the materiality raises out of what happens out of the case. And so the trustee in Mr. Jones' bankruptcy is still in possession of all of Mr. Jones' assets. It's still being administered. In fact, this last, within the last few weeks, he finally abandoned these assets that the judge determined had value to him and Mr. Jones said they didn't have value because he determined, the trustee determined there was no value to them. The question is, as this Court had referenced in Nielsen. Yeah, but Nielsen's a special situation. I mean, that was a no-asset bankruptcy, correct? That's correct. And what happened there was that a creditor wasn't listed, correct? That's correct. And so that's a totally different situation because if a creditor's not listed, then the bankruptcy doesn't apply to that creditor. So, I mean, if you file bankruptcy on your creditor, then I can come after you. I didn't know about the bankruptcy, so I can correct? This is a totally different situation. This is a different situation. What kind of fraud, then, would support the revocation of a discharge? If lying on the, if concealing assets is not fraud that would support revocation of discharge, what kind of fraud would support? One that would change the outcome of the administration of the assets. And what would that be? Give me an example. So, for instance, if Mr. Jones did not go to the trustee and say, here are all the notes receivable that I have. Here are, you know, all the properties that I own. The Chapter 7 trustee testified in the case that he received all that from the debtor. And he received it in time to administer it. And so creditors haven't been harmed one bit. And that's an important part of fraud is that there be some damage to somebody. So you're suggesting that notwithstanding the express language of 727-D-1, that as long as there's no ultimate harm when the whole thing filters through, it doesn't matter. Is that your test? I believe that should be the test, and I believe that's the test that was adopted in Nielsen, albeit under different facts, that that's the way the statute is written, that the statute is written that the discharge has to be obtained through the fraud of the debtor. So, again, let's go back to this. I'm sorry. Let's go back to the situation that I was asking you about before. Let's assume that the debtor conceals a very large amount of money, but somehow just before the discharge is granted, the trustee discovers that money and brings it into the estate and distributes it. Your view is that a discharge still should issue because it wasn't material? It would be a material misstatement, but that the fact is that then creditors have not been harmed, and so revoking his discharge when all creditors were treated the same as though he did disclose it is. Well, let's switch the facts a little bit from Judge Hurwitz's analogy. Let's assume for a moment that there was a $5 million home in Beverly Hills that was not disclosed. It was held in some nominee's name, and you go through the bankruptcy, but just before the plan was finalized, everything was going to be distributed, the hill gave way in Beverly Hills. The house and everything went down into a canyon, and it's not only worthless, but there's a huge claim by the neighbors below for the house falling on them. Under that situation, would there be fraud sufficient to satisfy 727? Under 727Z, nobody got hurt because at the end there wasn't any value there based on your standard. There would be a loss of value there because the trustee, assumably, would have the right to insure the property or would have the right to do something to protect the assets of the estate. But you're changing the hypothetical. What Judge Smith is asking is, let's assume there's a really good asset, there's a diamond ring that isn't disclosed, and it gets stolen. Forget about insurance for a second. You're saying it wouldn't be material because at the end of the day, it wasn't available for the people to get credit from. Well, the bankruptcy code itself requires that the trustee take possession of all assets of the estate. And so I guess that to the extent there, there would be harm to the creditors. The trustee couldn't take possession of the asset that he doesn't know about. I guess I'm trying to pin you down on your definition of materiality, and your definition of materiality is if at the end of the day, the creditors get what they would have gotten had this been disclosed, then it doesn't matter. Is that fair? That would be a fair analysis, and I believe that that's supported by the Nielsen and by the statute itself. Well, isn't Judge Mahan correct? The Nielsen is a very unusual factual situation. But you've got our BAP case, Gilliam, and you've got the Tenth Circuit case of N. Ray Edmonds. Edmonds suggests that subject 7D1 requires a showing that the debtor, in quotes, committed a fraud in fact would have barred the discharge had the fraud been known. Isn't that the correct standard for purposes of 727? Well, under 727A, yes, but we have here a different under 727D. Yeah. Congress chose the words obtained through the discharge was obtained through the fraud of the debtor, and that has to be causation language. That's what that statute means. That's not how our BAPs construed it, and that's not how Edmonds construed it, because they were specifically focused on 727D1. And I'm asking you whether aren't those two cases, the BAP case and the Tenth Circuit case, really well within the intent that Congress had as evidenced by the plain language of the statute? Well, no, because they didn't address exactly what that means, what does obtain through the fraud mean, that the discharge has to be obtained through fraud. And so the U.S. trustee didn't put on evidence that he obtained the discharge by fraud. And at a minimum, they should be required to say that, put on evidence, because this is strictly construed for the benefit of the debtor and against the objecting parties, that they would have fraud. What's an example of fraud, though? What kind of fraud, then, are we talking about? It's like you're arguing about the quality of fraud somehow. It's not, oh, he lied on his assets. And so these documents are voluminous, and debtors come into the court unsophisticated. It's not a problem. Well, but that's not this case. You're not quite there. What fraud? What fraud? So, for instance, the case that went to the Supreme Court, Murama, where the debtor owned a property free and clear and just never listed, a multimillion-dollar home, and he never disclosed it. And the case was acted upon based on those nondisclosures. Well, it's almost like Goldilocks, then. You know, well, this case is too small, and that case was too big. And so is that what you're saying? Is that the standard? No. It's the result. The result in Murama was the same. The result is always a discharge. Not always, but, I mean, typically, you go through bankruptcy, you get a discharge. Now, you lie, or not you, but the debtor, a hypothetical debtor, lied on his schedules. That's not sufficient, you're saying. We've got to examine what kind of a lie it was. What kind of outcome there was, because that's what fraud is. Fraud is something that causes damages. Fraud always results in discharge. A lie, his lie always results in a discharge. Not always, but typically, it results in a discharge. If he lies about something, generally, they don't find out about it, and it slides right through. And that's one of the unfortunate circumstances here, that due to this short time. So what kind of a lie, then, is the fraud that we should look for? What's the standard? One in which the result to the creditors is that there is no distribution, when there should have been. Judge Hurwitz has a final comment. So I want to follow up on Judge Smith's question. Let me make it a little bit better. Let's assume that you live in a state where your home is exempt. Florida, I think, is one of those states. And you don't list your home. You're required to list all your assets, but you don't list your home. Is that fraud? If they intentionally left it off, and no creditors would have received any distribution from it, then I don't believe it's cause for revocation. Okay. So you think that A is different than D, that the kind of stuff that a bankruptcy court could say, hi, I caught you, you're not getting a discharge, it doesn't match up with the kinds of things that can be later the basis of a discharge? That's exactly what the statute seems to indicate. Okay. I understand your position. Okay. Very good. Thank you very much. Let's hear now from your opponent. Good morning, Your Honors. May it please the Court. My name is Rebecca Kamitsuka. I represent the United States trustee, the appellee. First, to follow up on some of the concerns that the Court has, materiality isn't a money value. What materiality is, and this Court has held in rest, it's a fact. Well, a fact is material if it bears on the relationship of the debtor's business transactions or the estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission of a statement, or an omission, excuse me, that detrimentally affects the administration of the estate may also be material. It's not the amount of money. And I'll follow up. Well, but the statute doesn't use the word materiality. The statute says, shall revoke a discharge granted under subsection A if such discharge was obtained through the fraud of the debtor. So your opponent's position is that the discharge wasn't obtained through his fraud because everybody got what they would have gotten anyway. What's your response to that? Well, first, I'll say that the comment that the trustee has abandoned some assets. No, but put the factual issue aside for a second. Let's just address the legal issue. As I understand your opponent's position, it's if it's no harm, no foul. I mean, that's probably a nice way to describe it. That's the Jay Fern example. No, you know, they found the assets before the distribution, so there's no harm, no foul. And this says the discharge was obtained through the fraud. So how do you respond to the statutory language? Your opponent's making a statutory language argument. Why does this language tell us that the discharge was obtained through his fraud? Okay. First, there's no court that we could find at any level that agrees with the appellant's interpretation, narrow interpretation. Second, we were able to find several cases that agrees with our position. Okay. So the few courts that have addressed this think it's broader, but tell me why they're right. We've never addressed it. I'm sorry? We've never addressed it. The Ninth Circuit's never addressed it. This is an issue of first impression for us. So it's nice that other courts have addressed it. Perhaps they're correct. Tell us why you think they're correct. Well, actually, I think more than half a century ago, this court did address it in Keeble v. Suelmeier, and that's a false oath case. It's 727A4A, so I'll just, for simplicity, call it the false oath exception to discharge. But that's a different case, isn't it? Yeah, that's not what you're – it may be the same, but your opponent is saying A is different. A only requires that you make a false oath or account. D requires that the fraud – that the discharge be obtained through the fraud. That's what he's saying. Okay. Okay. I'll respond to that by saying that we don't agree with the debtor. Of course not. But if we had to find another fraud, the debtor made false oaths on the bankruptcy documents that were signed under penalty of perjury and filed with the federal court. Then he goes to his meeting of creditors, he's put under oath, and he's sworn to tell the truth. And he lies again. And then he gets his discharge. So you could say that he was – made false oaths knowing intentionally to the fraud creditors in his bankruptcy documents. And then he goes and he swears that he's going to tell the truth at the meeting of the creditors before the discharge is entered. So there's another fraud. We only have to find one fraud. And the court found that the debtor had testified – he swore he told all about – listed all his accounts. Let's go at it this way. I'd like you to give me the elements of 727D1. What must be shown to deny a discharge if someone has committed a fraud under 727D1? What are the specific elements? Two elements. The discharge was obtained through Mr. Jones' fraud. And the plaintiff did not know Mr. Jones' fraud until after he was granted a discharge. And the second element is not at issue in this case. Is not at issue. Okay. So as to the first one, you're reading such discharge was obtained through the fraud of the debtor just as if it only involved a false oath or account. In other words, you think there's no causation requirement in D. What the courts have held, and I have several cases that were cited in our brief, but for the fraud, had it been known timely before the discharge was entered, he wouldn't have got a discharge. Because the argument is if the bankruptcy judge had known of the fraud, he would have denied the discharge. That's correct. And so, therefore, I'm just trying to flesh out your argument here. Your causation argument is that the discharge was obtained because he withheld the information from the bankruptcy judge. Had he told the bankruptcy judge about the information, he wouldn't have gotten a discharge. That's right. So you're basically saying, then, that the N. Ray Edmonds Tenth Circuit case is exactly what the government wants in this situation, the trustee, rather. Yes. And there is also a Seventh Circuit case that's cited in Keeble v. Sulmeier. It's a seven-year-old case. But it rejects the argument that the appellant is making today, saying that no matter – if you accept – What's that Seventh Circuit case? Hannon v. Charnass. How do you spell the latter? C-H-A-R-N-E-S-S. And what's the site? 127 Federal Reporter. You mean, like, way back 50, 60 years ago? 1942. Whoa. 127 what? 894. 894. Seventh Circuit case in 1942. And the Court rejected it, reasoning that if you accept the appellant's argument, it means that no matter how much fraud the debtor perpetuates on his creditors and on the Court, he's safe so long as he can keep everyone in the dark until he gets his discharge. Well, that's not his position. His position is that if at the end no creditor is harmed in the making of this movie, then he hasn't violated D. And what you're saying is it doesn't require that a creditor be harmed. It requires the kind of conduct that would have allowed the bankruptcy judge, had he known about it before granting the discharge, to deny the discharge. Is that a fair summary of your position? The United States trustee's position is that the debtor has a duty. No, I know. Tell me where I'm wrong. Your position is that if the conduct is such that the bankruptcy judge could have denied a discharge on the basis of that conduct, then if the conduct was unknown before the discharge, then it qualifies under D to revoke the discharge. Yes. Okay. Is it your statement that Hannon v. Charniff specifically addressed 727-D-1? No. Actually, it was the Bankruptcy Act of 1898. Perfect. And they looked at Section 14C-1, which is now 727-A-4, which is the false list. So then we're back to A. Yeah, we're back to A. Yes. And then Section 15 is the equivalent of 727-D, which is the revocation statute now. So we can't put a whole lot of reliance on that case, can we? Well, I can move forward. I mean, it's the Seventh Circuit. We don't have to anyway. It is the Ninth Circuit. But the reality is in terms of it. There's no substantive difference. You're saying that we can be persuaded by the logic because it's the same. Yes. And the obtained through fraud language is still in there. It was put in the statute in, I believe, 1938. There are more recent cases. As we pointed out in our brief, there are Ninth Circuit BAP cases, Miller v. Gilliam, which is pointed out in the brief. We did file a Rule 28 letter last week. Are we bound by Gilliam, the BAP case? I think it's persuasive because it's the Ninth Circuit BAP. Persuasive reasoning, right? Yes. Okay. There's also, and you're not bound by this, but there's also a Central District California case, Ty v. Valencia, which makes the distinction between a discharge against all your creditors versus a discharge and this causal connection argument between fraud that a debtor did against one creditor and one debt versus against the entire bankruptcy system. I see I have just a few seconds, so I'll close up, wrap up. The foundation of justice starts with the truth. Facts, not fiction. Telling the truth, not evasive runaround and lying. The overriding principle in the bankruptcy system is that honest debtors are eligible for a fresh start. Dishonest debtors are not eligible and should not be rewarded with a fresh start if they hide their assets and they don't tell the truth. We know of no decision at any level that supports the appellant's argument. The court found that Mr. Jones committed fraud in fact, revocation was warranted, and unless the court has any other questions, the United States trustee respectfully requests that this court affirm the United States District Court's ruling affirming the bankruptcy court's ruling revoking Mr. Jones' discharge. Thank you very much, Your Honor. Questions from my colleagues? All right, thank you both for your argument. We appreciate it. The case of Jones versus U.S. trustee Eugene is submitted. We will now hear argument in the final case of the day, Evans versus Shoshone-Bennick Land Use Policy Commission. Mr. Thompson is first, right? May it please the Court. Counsel. My name is Aaron Thompson. I'm from Hokotello, Idaho, and I represent the Evans and the other plaintiffs in this case. The Evans are present here in the courtroom today. The Nevada v. Hicks case cited this language, and I think it is important for the court to remember this, as a preface to the Montana exceptions. It stated, in straight, we explain that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which Montana referred to. Tribes have authority to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules for inheritance of members. Can I cut to the chase on this? It's pretty clear that the Supreme Court, in almost all these cases, would be on your side. You've got one case that's troubling, and that's Brendale. Yes, Your Honor. How do you distinguish Brendale from this situation? Your Honor, the Evans situation is similar to the Wilkinson property in the Brendale ruling, and you've got to remember that there were two, in essence, decisions in that case. Well, there wasn't a morality. There's no assumption that Justice Stevens and Justice O'Connor made the law of the land in that case. Sort of, kind of, yeah. Under their concurring opinion, how do you win? Your Honor, in the Wilkinson property, Mr. Wilkinson went to apply for a zoning deviation by which there would be several acres, which they would subdivide, and there would be several, I believe, 20 single-family dwellings on the Wilkinson property. About 160, if I recall correctly, about 160 acres in this case. It was inside the whole reservation. There was no general access. Correct. From the public, they wanted to have a casino. They wanted to have, basically, guard towers. They wanted to have, basically, an entirely different change of scenery, if you will. Correct. In this situation, you've got a single-family residence near the airport of Pocatello. You've got a gravel pit. You've got a public highway. Help us with this, because, I mean, to me, that's really your, if there is a safety valve for you, that's it, and distinguishing why the governing rule that comes out of Brindale is distinguishable. Correct. But there are – in Brindale, there's the Wilkinson property and, obviously, the Brindale property. And the Brindale property was found in the heart of the reservation. Right. And that was the guard shacks and the, quote, unquote, closed area of the reservation. Right. The Wilkinson property was designated – they used the language open, although the court ultimately rejected that particular terminology. But what they said is, you have to look at the surrounding parcels. You have to look at it. And in this case, in the Evans case, it is almost directly analogous to the Wilkinson scenario in that the abutting areas, many single-family dwellings, and what they're asking for. In Wilkinson, I call it Wilkinson light, because in Wilkinson, they were asking for 20 single-family dwellings, dropping septic tanks and dropping wells in that scenario. And the court stated no tribal jurisdiction over the Wilkinson property. The Supreme Court – So what's – again, tell me what the rule of law that comes out of Barkindale is. Out of – excuse me. Out of the – out of the Brindale, I'm sorry, opinion. What's the rule of law? The rule of law is, is that you have to look at the individual properties on a case-by-case basis to determine the impact upon the subsistence of the tribe. And if that's the rule, then, remember, we – we only oust the tribal courts of initial jurisdiction when it is clear. So are you saying that there must be a factual finding – in other words, what troubles me about this is that we want to have a clear rule for district judges to obey. And what you're saying is, well, you have to look at the facts to determine whether or not the rule applies. Is that – am I correctly saying what your position is? Well, Your Honor, my position is, is that in the Brindale decision, unfortunately there are two decisions that came out of that decision. Right. But we have to – I think what we have to look is at the concurring decision as a controlling one. And, you know, I thought you might argue that what the concurring decision tells us, if we're dealing with an open area, then it's an open area in which we're just dealing with housing, that we're outside the jurisdiction of the tribe. But I'm concerned that if what we have to look at is the actual impact in every case, then we don't have a clear – we're talking about ousting jurisdiction from the tribal courts as opposed to deciding the case. You might win the case eventually. Is there a simple rule of law that we can apply in this area? Your Honor, I think we have to go back to the Montana. I think we have to go back to the two exceptions. And I think you have to look at the cases that interpret it onto the second exception to the Montana rule. Right. Including the recent decision of Plains Commerce. And the Plains Commerce decision at the end of the ruling makes very clear that the Montana second exception is to be limited, narrowly construed. We don't want a situation where the exception is swallowing the rule. And in the language that Justice Roberts included in his opinion, it must have a catastrophic impact and imperil the subsistence of the tribe in order for the second Montana exception to apply, thereby granting or allowing for jurisdiction in the tribal courts. So your answer to Judge Hurwitz's question is, yes, Your Honor, it is fact specific. And that's the only way you can do it because that's the way the Supreme Court did it in Plains Commerce because that's the only way you distinguish this earlier case. There's a presumption that tribal law does not apply to fee land in this situation. Correct. The Chief Justice distinguished that case as a very narrow, factually distinct situation. And in reality, even though words are words are words and it might make it more difficult for a district judge, the fact is that's what the Supreme Court's done. That's the language we have to follow. Right. So what you're saying, Chris, and I appreciate this exchange here, what you're saying is that you start out with a presumption that tribal law doesn't apply here and that the tribe then has to demonstrate that this is one of those rare circumstances that it's within the second Montana exception. Correct. Okay. If this were land encircled by the reservation, exactly the same situation, let's assume a very thin strip of the reservation, went around. I take it there's an airport right next door. That's correct. So it went around right by the airport. Would we have a different situation? Factually, you'd have to look at that case, and I think you have to compare that to the Brendel analysis. Unfortunately, Brendel. In that case, given the split in Brendel, there would probably be tribal jurisdiction, wouldn't there? Unfortunately, Brendel would leave us with the question of whether or not it is sufficiently closed for the purposes of asserting tribal jurisdiction. If the tribe maintains the ability to zone, if the tribe has the ability to permit land use permits and a general planning type scenario, there's a lot of facts that go into the analysis. But once again, we have to hop back to Montana. We have to hop back to that second exception. And the reason why I started, Judge Hurwitz, with the preface, I think that the preface to the Montana exceptions is often forgotten. Although it is cited in Strait, it is cited in Nevada v. Hicks, and it is cited in other important cases determining tribal jurisdiction. And that is defining specifically what the court had in mind in Strait with regard to what a tribal government could do. And that is controlling internal matters such as divorces, inheritances, membership, those things that maintain internal political sovereignty to the tribe. And the reason I ask questions about that is it just seems to me strange that if there had been a strip of land around the other side, we would be on the other side of the Montana exception. We would be saying, well, but now we're talking about internal sovereignty. But if there isn't a strip of land around the other side, then the burden shifts. And I guess that's what the Supreme Court has told us. Again, in your response to Judge Hurwitz, isn't it the case that even if there were a strip of land around it, that's just the beginning of the analysis? It doesn't change the presumption. You've got to have a series of other things which in the aggregate would bring catastrophic consequences, to quote the Chief Justice, to the tribe. What you had in Brendel is a situation where right in the middle of the reservation, somebody's going to put in a casino, bring in the public stuff. It totally changed the character. There was a religious component to that area. There were just all kinds of things where this would mess up perhaps millennia of tribal involvement and tribal customs. None of that's present here, is it? It is not. In fact, following along with that example, if you put the Evans property, a single family dwelling right in the heart of the closed area, as in Brendel, there may still not be tribal jurisdiction. Well, that's what I was trying to ask about. And I didn't articulate it well, Your Honor. I apologize for that. Your Honor, I would like to set aside five minutes for rebuttal. Okay. If you want to just keep the remainder of your time, okay. Thank you. That's fine. We'll hear from Mr. Echohawk. Thank you, Your Honor. May it please the Court and counsel, I'm Mark Echohawk, and I represent the Shoshone-Bionic tribes. National farmers and Iowa Mutual are still the law of the land. The development of cases from the U.S. Supreme Court is important. As the Court mentioned in the beginning, there are multiple Supreme Court cases that have language that are on the other side of this question, seemingly. But if you look at the factual or the legal development, National Farmers and Iowa Mutual came out in 1985 and 1987. Since then, three times the United States Supreme Court has decided, has issued opinions that have some bearing here. Hicks, Strait, and Plains Commerce all came out subsequently. But those three cases were not exhaustion cases. In fact, just to the contrary, exhaustion happened in those cases. In Strait, they exhausted up to the Tribal Court of Appeals. In Hicks, they exhausted. And in Plains Commerce. After those cases, now that they've all been, and I take your point, it was one of the questions that troubles me in this case, which is how much of a showing do they have to get to not have to exhaust? But now that those cases have been decided, how can you argue that it isn't clear that the tribe can't exercise jurisdiction over this particular situation? In other words, we have those cases now, even though they weren't exhaustion cases. They tell us, Strait tells us that the land use must threaten tribal self-government. How does this threaten tribal self-government? Your Honor, you can still make that argument because in Strait, it says, in cases such as this one, and literally the second to the last sentence of that opinion, in footnote 14, it says, in cases such as this one, where you have a run-of-the-mill accident on a State right-of-way, on a State highway, exhaustion wouldn't make any sense because the law makes it clear, almost impossible for the tribes to have jurisdiction. Same thing with Hicks. Okay. So why doesn't, and I guess my question is, no matter how those cases arrived at the Supreme Court, whether they arrived through an exhaustion posture or whether they arrived by somebody going to district court initially, tell me how, in light of those cases, you can now argue that the, in effect, your zoning authority or your building permit authority over the Evans House is, that if they went the other way, it would threaten tribal self-government. How does their building threaten tribal self-government? Or the integrity of the tribe's political situation? Your Honor, in none of those cases, Strait, Hicks, or Plains Commerce, were you dealing with non-Indian activity that was occurring on the land. In Strait and in Hicks, you have a rule that comes out that says there are some situations where it's almost impossible for a tribal court to have jurisdiction. For example, in Hicks, where you have State officers performing State, you know, official duties, tribal courts can't weigh in on that. And similarly, with a State right-of-way on a State highway, tribal courts can't really weigh in on that. The same thing with Plains Commerce. They said, we're not really dealing with activity that's occurring on the land. It can't really harm tribal governance. But you have argued for, at least, bases that are just such things that you claim are the basis of their having to go forward with an exhaustion claim in this situation. Now, you're not? Yes, Your Honor. So which way is it? Does it count or doesn't it count? There are multiple grounds for tribal jurisdiction in this case, not just Montana exceptions, not just whether they're activity in perils. We'll get to the treaties and all that sort of thing. But we have the Elliott case, which you're very familiar with, that indicates when it's plain, the tribal jurisdiction is lacking, that there's no exhaustion requirement, when it would serve no purpose other than delay. Do you have any case law, either from the Supreme Court or our court, that says to the contrary? Your Honor, there are multiple cases that define what plainness means. Okay, well, let's say that's true. But the reality is plainness, based on current Supreme Court law, which is what we're dealing with, if in the judgment of the court we conclude that the facts of Glendale are wholly distinguishable and that the facts here don't conform, there is no requirement, is there, under Elliott, that this go through an exhaustion when at the end of the day all it does is delay the inevitable? If that were true, yes, but here it's not. The only rule we have from the Supreme Court is Glendale, and that's a factually intense inquiry. And it is a factual inquiry, which we have to engage in. And if you look at the facts of Glendale, if we have those kinds of facts here, then, of course, you're absolutely right. But if, in fact, we don't have such facts, we have wholly distinguishable facts, then would you not agree that there is no requirement to exhaust, because at the end of the day you've done nothing but delay? That would be true if we had a fully developed factual record. Here we don't. In fact, we cannot do justice to the jurisdiction question in this case, because a full factual foundation has been frustrated by practicality and procedure. As a matter of practice, the tribe's efforts to gather information, the very information Glendale wants us to look at, have been stymied. We never got to see building plans. But you got Judge Windmill, who's an excellent judge, allowed you to bring in a whole bunch of things in your reply brief and gave the other side a chance to respond and so on. You got all kinds of things in that may not have been fully developed, but you certainly got the legal points in. You got the cases in. You have arguments about water. You've got arguments about fire. You've got arguments about all kinds of things. Is there anything that would need to go in that you believe is not in the record now? And if so, what is it? Absolutely, Your Honor. It's the full decisional matrix that a tribal court would develop. But you're saying in order to show that they have to exhaust, we have to go through the exhaustion? Your Honor, to conduct a true merits analysis is to ignore the very purpose of exhaustion in the first place. We have in this case maybe 14, I don't know the exact count, affidavits that were prepared in a window of preliminary injunctive relief procedure compared to, and that's a pretty thin record, compared to depositions, discovery, witness testimony sworn on the stand. In Brindale, we had that kind of factual record because they had multiple actions in federal district court to develop that factual record. Here we would have, if we went through discovery, we would have that full decisional matrix. And would that matrix counsel occur as part of the tribal court, a tribal exhaustion, or would it occur in the district court? Part of the tribal exhaustion. It would occur in the district court. I'm sorry. It would occur in the tribal court. So basically the exhaustion question is subsumed into your contention. By definition, you say that an exhaustion must occur through the tribal court in order for you to develop the record, which basically eclipses the question to start with. Unless you have facts that bring us within Strait or Hicks or Plains Commerce, where you know the tribal court cannot have jurisdiction. But because it's a Brindale case and because that's factually intense, we need that kind of discovery to do justice to that jurisdictional question. Put aside your treaty arguments for a second, because I'm still stuck on the Montana exception. We have here somebody who wants to build a single-family residence on property that he owns. Why does the inability of the tribe to issue a building permit and licenses with respect to that property threaten its political integrity? We learned in Brindale that even decisions in discrete zoning cases have incremental shift impact on the tribe's ability to define the essence of the reservation. And even though it's a single-family dwelling, especially in this particular area where you have a Superfund site, you have EDV, ethylene digromide contamination concerns. Even a single-family dwelling can either have adverse impacts on the residence. But that's all speculative, is it not, counsel? I mean, like with the water, that's been there for over 20 years, that issue having nothing to do with this gentleman's site. Are you saying that speculation about what a Superfund site might do is enough to trigger the exhaustion requirement in the tribal court? I'm saying it, and so is the Eighth Circuit, and so is the Ninth Circuit. In both Rincon and in the Dish Network v. LaDucer cases, they talk in terms of potential impact. Could it impact tribal interests? And until we have that information, this Court can't really make that call. And eventually, this is the place the federal court will weigh in on whether the tribal court is extending boundaries of jurisdiction too far. But it can do that only fairly after it has let that factual record develop and it has the benefit of tribal expertise in addressing these very particular questions about the tribal ordinance and the treaty itself. So in some ways, the arguments that both of you are making come down to burden of proof. What your opponent is saying is that we have a house in an open area next to the reservation. They've got to show that there's some extraordinary effect on tribal integrity in order to bring us within the jurisdiction. And you're saying we sort of start off with the assumption that you're inside the reservation, that you're affecting tribal integrity, and now we'll go do discovery to see if you can disprove that. Is that a fair statement in the way that you two are? Almost, because National Farmers Union and Iowa Mutual start with a presumption just the other way, where they say we presume this is going to be a tribal court jurisdiction matter unless these exemptions apply. And those are the only cases. Those are still the law of the land. Strait didn't overrule it by a footnote sub silentio. But I thought that the presumption was just the opposite, that in fact the presumption is that fee land within the reservation, there is a presumption against tribal jurisdiction. Isn't that correct? The cases that have talked and used that language have been exhaustion cases where exhaustion has already happened and the federal court now is weighing in on the actual merits. There's no case where exhaustion hasn't happened where the court says we're going to start with this premise and we don't even need you because it's a Brindale analysis. And this is, I'm talking about this Brindale factually. So from your perspective, if there's any possibility of anything, however speculative, it all has to run through the exhaustion of the tribal court, that the presumption issue is by the board, plains commerce is by the board. You're going to get that first. And then you'll see whether the tribes who have already exercised jurisdiction have jurisdiction. Not quite, Your Honor. What I'm saying is not just is there any possible chance out there. Speculation is what I'm suggesting. It's a low standard. This is the Ninth Circuit standard in Elliott. Is it plausible or colorable? And that does not mean that we first conduct a full merits analysis and we kind of figure out how the federal court is going to weigh in on this and we just save everybody the time. But what we're dealing with here is it not under Elliott. We have to put flesh on this. And in that case, in Elliott, we made clear that they do not have to do that if it has no other purpose than delay. So if the law in interpreting the Supreme Court cases and so on suggests that, in fact, there is no jurisdiction, then there is no requirement of exhaustion. Is there? That would be true. But the law as it stands is Brindale on this particular question. What it says is you have to look at the facts. And we don't have those facts yet. Your Honor, in the last couple of minutes we have. Well, wait a minute. What facts don't we have? What facts don't we have? You had the opportunity to develop the facts, right, when you filed how many affidavits? Your Honor, we had about we had several weeks to develop by affidavit facts that are here. And for my question, though. So we have had some opportunity, but that is nothing compared to what Brindale actually had. We would love to bring to this Court all the facts. But Brindale is a different situation. I mean, because Brindale, you're dealing with two separate, I don't want to call them parcels. I can say parcel not in a technical sense for the real estate lawyers, but two parcels of land, right? I mean, Wilkinson and Brindale is how I think of them. But one was Wilkinson was very much like this land. Yes, Your Honor. But in Brindale they had two separate district court, federal district court actions to develop those facts and bring them to the Court to make that decision. So what is it that you want us to do? Do you want us to send you back to the district court so you can fully develop the records so the district court can decide this issue? I thought you wanted to go to you wanted to force them to exhaust. That's correct. I want this Court to follow what Judge Windmill decided was the right thing. And he was saying we don't have enough facts. Besides, to gather those facts and decide now would intrude upon the very purpose of the exhaustion doctrine, which is still the law of the land. Let's go to tribal court, develop that record, and then bring it back here. The evidence have a remedy in federal court after the fact, but only after all the facts that we need are actually brought to the table. Your Honors, in the last few seconds that I have, I want to point out that it is plausible under the law, either under the treaty or congressional delegation or under a Brindale analysis, Montana Second Session analysis, the law permits the possibility. And it's a low standard to show that plausible or colorable nature of the case. And the facts show it. Of the multiple affidavits, the tribes, even in a few weeks, were able to show that there are multiple straight-faced concerns here. The Shoshone-Urbanic tribes have significant ties to this land. This is their permanent homeland, promised by treaty, which is the supreme law of the land. They have the right, under National Farmers and Island Mutual, to develop a record and present that to the Federal courts at some point to review. I think we have your argument, and thank you very much for that, counsel. You have a little rebuttal time, counsel. Your Honor, one of the questions, Justice Hurwitz, that you asked of Mr. Echo Hawk was with regard to jurisprudence. And the fact that we have, since the exceptions or the exhaustion rule has been denominated, don't we have something now to rely on to determine what is plain and what is not plain? The Ninth Circuit defines plain as plausible or colorable. No question. That's where the Ninth Circuit comes down on that. But we do have a number of cases that have come down that have defined. And that's the reason why I place so much emphasis, Your Honor, on the Brindell and specifically the Wilkinson property. This is Wilkinson right. Single-family dwelling versus 20 single-family dwellings with septics and wells. Now, Justice Smith, you brought up — By the way, I should remind you, there's no justice in the Ninth Circuit. We're all judges. Judge Smith, I apologize. You can take that however you want. I apologize. You asked a very good question with regard to burdens. And you're right on. The burden here is on the tribe to show that there is tribal jurisdiction. What did they do in the factual determination that was placed before Judge Windmill? They submitted many affidavits that they were attempting to fit within a set of facts that would create plausible and colorable arguments of jurisdiction. They argued groundwater contamination. And as Judge Smith correctly indicated, it had been — the EDB concerns had been in effect since 1993. They argued illegal dumping, but there was no nexus made to the Evans property. Only somebody on the reservation dumped construction waste elsewhere. And then the third thing that they brought up was, well, we've got a concern about fires. And what they were trying to do, Your Honors, is they were trying to bring that into the Rincon Mushroom analysis. Big difference between this case and Rincon Mushroom. In that case, which is an unpublished decision, by the way, factually, the fire actually happened in that case, and it was right across the street from the casino, which was the primary source of income for the tribe. Also in that case, there was an allegation of groundwater contamination, but it was the only source of groundwater for that particular tribe. Wholly distinguishable from this case. Wholly distinguishable. In this case, correct me if I'm wrong, I thought I saw in the record a kind of a photograph of this area. I didn't see any trees anywhere close to this place. Is that fair? Your Honor, if you've ever been to southeast Idaho, trees are a spot. I actually have. Yes.  This is kind of like a little rolling plain kind of area, right? Correct. Very full of sage, intermountain desert, airport directly to the west, agricultural land to the northwest, and the Evans property sits within a bunch of other single-family dwellings, which are non-Indian fee land. As I understand it, one of the neighbors, and I've forgotten the name, was required by the county to go through a zoning process at an earlier period of time, and that the tribe did try to intervene in that case and was not successful. Is that correct? Your Honor, I believe you're referring to the Sorter opinion, which was a Power County case that prosecuted Mr. Sorter for not obtaining a county building permit, and the sixth district and the county and the state court upheld and required Mr. Sorter to obtain and actually charged him criminally, found him criminally liable for not obtaining a building permit. And did the tribe or one of the tribes intervene or try to intervene in that case? Your Honor, the only thing that I can say is that Mr. Echo Hawk represented Mr. Sorter in that, but as far as an intervention is concerned, I don't want to misstate a fact. I'm not sure. I understand. I'm not sure. So tell me what, do you agree that plausibility is the standard? I do. What would the tribe have to show to establish plausibility in your view? Your Honor, in the affidavits to fulfill their burden, they need to show something. They need to show something that creates a nexus between, in this particular case, what the Evans are doing in building a single-family dwelling and the potential to imperil the subsistence of the tribe's sovereignty and its ability to internally regulate, something. And, Your Honor, when you look at the ---- Can this be an aggregate analysis, or must it be an individual analysis? It can be an aggregate analysis. It hasn't been done here. The affidavits, which the burden remains on the tribe to assert that they have jurisdiction because it's presumptively invalid in this case, they have to come forward and they can, in an aggregate situation, on a fact-by-fact, case-by-case analysis, can assert those jurisdictional plausibility elements. It was not done here. As I understand your argument, you're saying, yeah, that plausibility is the Ninth Circuit standard, but that the meaning of those terms has been provided by Plains Commerce, which indicates how extremely narrow the Montana II exception is, and that we then get to the exhaustion. The only requirement or the only purpose would be to delay that Brendale, as informed by Plains Commerce, provides the meaning, if you will, of plausibility or colorability in this case. Absolutely. We can't look at what plain and colorable and plausibility. We can't look at it in a vacuum. We have to look at it based upon the jurisprudence that's already been provided. That's the whole point of precedence. Okay. Either of my colleagues have other questions? I do. Thank you both for your fine arguments. We appreciate the hard work that you have done. This is a very difficult and interesting case. We appreciate its importance, and we thank you for your help. The Court will now stand in recess for the day.
judges: Mahan, Smith, Hurwitz